[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 195 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 196 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 197 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 198 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 199 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 200 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 201 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 202 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 203 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 204 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 205 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 206 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 207 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 208 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 210 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 212 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 213 
The fifth section of the will of the testator contains this provision: "As to all the rest and residue of my estate, real "and personal, whatsoever and wheresoever, I give and devise "and bequeath the same, in three equal parts to be divided, "as follows: One third part to my son Isaac, one third for the "use of my son James Barclay, and one third, in five equal "shares to be subdivided, to the children of my deceased "daughter, Mrs. Grace Bayley, or to trustees for their benefit." "The respondent was one of the children of Mrs. Bayley.
The language of this devise and bequest is sufficiently comprehensive to embrace all the estate of the testator, of which no specific disposition was made by the will in question.
In August, 1842, the year following the execution of the will, the testator published his second codicil. It recites that the testator, by the fifth clause of his will, had directed all hisresiduary estate "to be divided into three equal shares, and distributed "accordingly." It then states the death of James Barclay Roosevelt, one of the residuary devisees, without issue, and directs that "the said residuary estate of the testator, "instead of being divided into three shares, and distributed "as aforesaid, shall be divided into two shares, and be "distributed, one share to Isaac, and the other to the children "of Grace Bayley." The residue thus disposed of is admitted to be the same as that provided by the fifth clause of *Page 214 
the will above mentioned; but the respondent insists that the testator did not intend to include in such residue the trust funds and reversions created by the second, third, and fourth clauses of his will. The answer to this suggestion is, that the language of the fifth section is sufficiently broad, as we have seen, to constitute it a general residuary clause, extending to all the property of the testator, whether in possession or expectancy, not otherwise appropriated. The testator has in effect so denominated it in the second codicil; for he there refers to the fifth item, as containing directions for the disposition, not of a particular residuum, but "of all his "residuary estate." We have therefore the language of the testator and his construction of its meaning, and both are opposed to the limitation claimed by the respondent.
The second codicil became a part of, and was a republication of the will, not only by operation of law, but according to the express directions of the testator, and the two must be construed together as one instrument. (Barnes v. Crowe, 1 Ves. Jun. 486, Sumner's Ed. and note; Mooers v. White, 6 John. Ch. R. 375; Westcott v. Cady, 5 John. Ch. R. 344, and cases therecited.) The effect of the codicil was to modify the fifth section by changing the proportion of the residuary estate which fell to the share of Isaac, and the children of Grace Bayley respectively, from one third to one half, without changing the subject of the devise, or the persons of the devisees. The testator did not, as supposed by the counsel of the respondent, add to the one third of the residuary estate given to the children of Grace Bayley, by the fifth section, the one half devised to his son James by the same clause. On the contrary, the testator limited his action to a single subject, the residuary estate, as an entirety. He accordingly declared, in the second codicil, that it was his will, that his residuary estate,instead of being divided into three shares, and distributed to three devisees, according to the fifth section, shall be divided into two shares, and distributed to the two there designated. The latter provision became a substitute for and *Page 215 
thereby repealed the former. Otherwise we must assume that the testator believed that he could divide and distribute the whole of the same fund, at the same time, in three parts, to three, and in two parts to two beneficiaries.
The sixth and seventh clauses of the will, upon which so much reliance has been placed by the respondent, are consistent with the view that the testator recognized the fifth section as a general residuary clause, and consequently that he did not contemplate intestacy, or in fact die intestate as to any part of his property.
The sixth clause directs that the particular residuum, in the possession and under the control of the executors, at the death of the testator, after setting apart so much of the estate as might be necessary to pay annuities, legacies, and debts, shall be divided among the "residuary legatees mentioned in "item fifth of this will, according to its provisions."
The seventh section, in like manner, directs the distribution of the reversionary interest in the property and trust funds created by the previous clauses, as the lives of the devisees, legatees, and cestuyque trusts should terminate respectively, "unto the same persons, in the same proportions as set forth "in the fifth item." It is true that the reversion in the farm, c., at Poughkeepsie, was thereby granted to a grandson, or his issue, in case he or they should survive the wife of the testator, to whom a life estate had been limited in the same property. If the contingency happened, the residuary estate would be so much diminished; if not, the reversion went to form a part of the general residuum, and with that be distributed in conformity with the provisions of the fifth section.
The main object of the sixth and seventh clauses above mentioned, was to compel a distribution of the different portions of the estate of the testator, from time to time, and whenever a division would give to the beneficiaries the possession and beneficial use of the shares allotted to them, respectively.
The sixth, accordingly, relates to property in possession of *Page 216 
the executors, exclusive of trust funds, c.; the seventh to that in expectancy. And the two constituting, in the language of the will, "the whole residue and remainder of the "estate" (after satisfying special gifts) were at the prescribed periods, to be distributed among the persons, in the proportions, and subject to the trusts declared in the fifth or general residuary clause.
The views suggested, if correct, dispose of the question before us.
In March 1844, the third codicil was made and published. The testator therein declared "that by the fifth section he had "devised and bequeathed to James R. Bayley (the respondent), "aportion of his estate" — that the beneficiary "had "renounced the faith of his fathers," and he then proceeds "to annul the aforesaid bequest and devise," and gives to the appellants the portion so given by his last will and testament to the respondent.
If the testator had died after the second but before the publication of the third codicil, what share of his estate would have passed to James R. Bayley, by the fifth section of the will, modified as it then was, by the second codicil? Not a fifteenth, as originally given, but three-thirtieths of the residuary estate.
The learned court whose decision we are reviewing, say "that the codicil operated as an enlargement of the devise and "bequest contained in the 5th section of the will." Such is our opinion. So thought the testator; and when he alludes to a portion of his estate there devised to the respondent, he refers to the portion augmented by the operation of the second codicil. And when he directs that the appellants shall take the portionso given by his last will and testament, he means all that was given by the instrument, of which the codicil was an indispensable part.
The respondent would separate the gift bestowed by the fifth section, prior to the publication of the codicil, from what he terms the "increase" granted by the second of them. *Page 217 
The effect of this construction is first, to divide the second codicil from the original will, of which the testator declared, "it should be a part, to all intents and purposes." Second, it assumes that the testator having enlarged the devise in the fifth section by the second codicil, through accident or design, reinstated that section as it stood originally, for the purpose of depriving this devisee of the share there given, leaving him the "increase" bestowed by the second codicil to dispose of at pleasure. In a word, that the testator intended to deprive this beneficiary of a fifteenth, and leave him a thirtieth part of his residuary estate, to build up a faith which the donor deemed "erroneous and unholy," and this in the face of the express declaration that he did not deem it "just "that any part of the property which God had given him" should be thus appropriated. Such was not the will or the language of the testator.
Whatever may be thought of his motives in excluding the respondent from the list of beneficiaries, we must give effect to his intention, if plainly expressed. The respondent was undoubtedly honest in changing his religion — the testator may be presumed to be equally conscientious in adhering to his own. It is enough that he was the sole judge whether any part of his property should be at the disposition of a Catholic clergyman, or be applied to sustain a seminary professing to teach the doctrines in which the testator was a believer while living, and in the faith of which he probably died.
The decree of the superior court must therefore be reversed in the particulars appealed from, and a decree entered in conformity to the views above suggested.