In the Matter of Herbert M. Citrin, Petitioner, against Salvatore Belcastro, Defendant.

Domestic Relations Court of the City of New York, Children's Court, New York County, July 19, 1949.

*John F. Smithers* and *Thomas F. Becker* for Herbert M. Citrin, agent of the New York Society for the Prevention of Cruelty to Children, petitioner.

*Herman Lieblich* for defendant.

Sicher, J. There is presented a novel question as to the jurisdiction of the Children's Court Division of this statutory civil court to entertain a criminal prosecution of an adult other than a parent for allegedly contributing to a mother's neglect of her children. " The Children's Court and the Domestic Relations

Court of the City of New York, of which it is a part (L. 1933, ch. 482), are courts of inferior and limited jurisdiction. Such ' jurisdiction will never be presumed and the facts necessary to confer jurisdiction in any particular case must affirmatively appear in the record' (*People* v. *Smith*, 266 App. Div. 57, 60). \* \* \* The Children's Court branch of the Domestic Relations Court has no jurisdiction to enforce statutes penal in their nature, except as collateral to its primary jurisdiction. (See in this respect, *People* v. *Rogers*, 248 App. Div. 141, affd. 272 N. Y. 612; *Matter of Kane* v. *Necci*, 269 N. Y. 13.)'' (*Matter of Gardner* v. *Domestic Relations Ct. of City of N. Y.*, 184 Misc. 44, 46, 47, SWEZEY, J.)

The sole asserted jurisdictional basis for the instant proceeding is the first sentence of subdivision 2 of section 61 of the New York City Domestic Relations Court Act, the whole of which subdivision reads:

'' 2. *Adults; offenses against children.* The children's courts shall have jurisdiction, *whenever the issues involving a* delinquent or *neglected child are before the court* summarily to try, hear and determine any charge or offense, less than the grade of a felony, *against any parent, or other person in loco parentis to such child,* involving an act or omission in respect to such child in violation of any law of the state or ordinance of the city of New York, or *which has or is alleged to have contributed to the* delinquency, *neglect* or dependency *of any such child;* and the court is authorized and empowered to render judgment therein, and if judgment be rendered sustaining the charge against such parent or other person the court shall have power to fix such punishment as the law provides, or may, in the discretion of the court, suspend sentence or place on probation, and by order *impose upon him such duty as shall be deemed to be for the best interests of such child.* Such court shall also have jurisdiction, *whenever the issues involving a delinquent child are before the court,* summarily to try, hear and determine any charge or offense less than the grade of a felony against *ANY person* alleged to have contributed to *such child's delinquency* and may impose the punishment provided by law for such offense.'' (Emphasis supplied.)

The second sentence was added (L. 1936, ch. 346) on April 9, 1936, to confer jurisdiction over any person alleged to have contributed to a child's *delinquency* (see *Zambrotto* v. *Jannette*, 160 Misc. 558); it does not include contributing to neglect.

The first sentence, which in its present form has been part of the statute since its original enactment, also includes contributing

to neglect and dependency as well as contributing to delinquency. But its terms are limited to " any parent, or other person in loco parentis to such child ".

The defendant herein is not a parent of the neglected children involved.

It is contended by the defense, and conceded by the prosecution, that in any event this court's jurisdiction under subdivision 2 of section 61 of the Domestic Relations Court Act to try criminally an adult alleged to have contributed to the neglect of children extends only to parents or other persons *in loco parentis* to the children neglected. Accordingly, unless the evidence establishes that the defendant is *in loco parentis* to the children who have been adjudged " neglected ", the complaint must be dismissed as a matter of law for lack of subject-matter jurisdiction.

No controlling authority has been cited or found.

Subdivision 2 of section 61 of the Domestic Relations Court Act has only once been the subject of appellate court consideration (*Matter of Humann* v. *Rivera,* 272 App. Div. 352); and that case dealt solely with the prosecution of a *mother* for allegedly contributing to the *delinquency* of *her own child.* It did not touch the instant question of a *third party's* alleged contribution to *parental neglect.* However, in *Matter of Humann* v. *Rivera* (*supra*) the Appellate Division, First Department, adjudged inapplicable to subdivision 2 of section 61 of the Domestic Relations Court Act its prior decision (*People* v. *Rogers,* 248 App. Div. 141, affd. 272 N. Y. 612) which had construed subdivision 4 of that section in the following language (pp. 145-146): " The Penal Law, the Code of Criminal Procedure and the Inferior Criminal Courts Act regulate the manner of prosecuting and convicting criminals. A consideration of the provisions of these laws in connection with the Domestic Relations Court Act leads to the conclusion that there was no intention to transfer to the Domestic Relations Court the power to try misdemeanors. Such exclusive jurisdiction is lodged within the City of New York in the first instance in the Court of Special Sessions. (Inferior Criminal Courts Act, § 31, subd. 1.) A crime is prosecuted on an indictment or information. No provision is made in the Domestic Relations Court Act for either. A misdemeanant is entitled to a trial by three justices of the Court of Special Sessions of the City of New York (Inferior Criminal Courts Act, § 34) unless there is a waiver. (Inferior Criminal Courts Act, §§ 43 and 44.) The Domestic Relations Court Act provides for no such safeguard. As pointed out in *Matter of Kane* v.

*Necci* [269 N. Y. 13] (*supra*), the right to appeal from a conviction of a crime is radically different from the right to appeal from a judgment or order of the Domestic Relations Court." Nevertheless, *Matter of Humann* v. *Rivera* (*supra*) squarely held that the combination of subdivision 2 of section 61 and section 75 of the Domestic Relations Court Act effectually confers on each Justice of the Children's Court Division of the Domestic Relations Court of the City of New York jurisdiction individually to try, hear and determine charges of a grade less than a felony against a parent or other adult alleged to have contributed to a child's *delinquency*. But in reversing the conviction of appellant Genevieve Rivera for failure to accord her upon the trial the procedural protection owing to a defendant accused of crime, the Appellate Division stressed that, in contrast with a delinquent-child-petition hearing, which is a civil proceeding (*People* v. *Lewis*, 260 N. Y. 171), an adult prosecution under subdivision 2 of section 61 of the Domestic Relations Court Act is criminal in nature and therefore subject to all the rigid formalities and technical safeguards of the criminal law. Obviously, that mandate of standards for the criminal prosecution of an adult charged with contributing to a child's delinquency applies to such a prosecution for alleged contributing to neglect.

Among those requirements is the fundamental principle that " Penal statutes must be strictly construed, and cannot be extended to cases that are not clearly covered thereby " (*People* v. *Nelson*, 153 N. Y. 90, 94; see, also, *People* v. *Rosenberg*, 138 N. Y. 410, 415, and *People* v. *Knopfer*, 192 Misc. 521, 522). And although section 21 of the Penal Law directs that all the provisions thereof shall be liberally interpreted, such relaxing of the foregoing general principle of strict construction is applicable only to the Penal Law and not to any other penal statute (*People* v. *Thomas*, 71 Misc. 339).

Relevant, also, is the caveat: " in cases of doubtful construction * * * that interpretation should be given which best protects the rights of a person charged with an offense, to a trial according to the common law." (*People ex rel. Cosgriff* v. *Craig*, 195 N. Y. 190, 197.)

The phrase " other person in loco parentis " in subdivision 2 of section 61 of the Domestic Relations Court Act must therefore be strictly construed in the light of the particular facts.

On August 27, 1948, " Walter Horton " (name disguised), aged eight, and " Andrew " and " George Horton " (names disguised), four-year old twins, were duly adjudicated " neg-

lected children '' (N. Y. City Dom. Rel. Ct. Act, § 2, subd. [17]), upon a petition against their mother, verified and filed by an agent of the New York Society for the Prevention of Cruelty to Children, alleging *various* incidents of improper guardianship, *including* the mother's permitting one Salvatore Belcastro (defendant herein) to discipline those three children over-severely. On the last-mentioned ground, and others unnecessary here to recite, a '' neglected child '' adjudication was made by me at the close of a hearing that day at which petitioner, the mother-respondent, said Salvatore Belcastro, and third-party witnesses, testified; and the children, after having also been seen and questioned by me in Chambers as part of such hearing, were thereupon remanded for detention care pending the customary probation bureau investigation and, pursuant to subdivision 7 of section 61 of the Domestic Relations Court Act, a psychiatric examination of the mother.

Subsequently, in the light of the ensuing probation bureau and court clinic reports and in the exercise of this court's '' neglected child '' jurisdiction, '' Walter '' was paroled in the custody of a maternal uncle in Maine subject to this court's supervision and further orders in co-operation with a local Maine juvenile court and the twins have been remanded to a boarding home in New York City and are adjusting favorably (N. Y. City Dom. Rel. Ct. Act, § 61, subd. 1; § 83, subds. [b], [d]).

Thereby all contact between defendant and the three children has been terminated and their protection calls for no further present steps against him.

Thus, through the timely filing of a neglect petition the children are now being safeguarded, and their welfare is the current concern of this specialized *civil* court whose hearings and records are private (N. Y. City Dom. Rel. Ct. Act, §§ 45, 52) and which is animated by the social philosophy that in its operation '' The concept of crime and punishment disappears '' (*People* v. *Lewis,* 260 N. Y. 171, 176, *supra*).

Nevertheless, not content with having brought these three children promptly under the protective jurisdiction of this private hearing, civil court without exposing them to the trauma of newspaper accounts of their plight, the zealous petitioner-agent of the New York Society for the Prevention of Cruelty to Children conceived it his duty also to prosecute criminally said Belcastro for the severity of the discipline he had inflicted, although with the mother's acquiescence and assertedly within the ambit of subdivision 4 of sec-

tion 246 of the Penal Law, which provides: " To use \* \* \* force \* \* \* upon \* \* \* the person of another \* \* \* is not unlawful \* \* \* 4. When committed by a parent or the *authorized agent of any parent,* or by any guardian, master, or teacher, in the exercise of a lawful authority to restrain or correct his child, ward, apprentice or scholar, and *the force or violence used is reasonable in manner and moderate in degree ".* (Emphasis supplied. See *People* v. *Mummert,* 183 Misc. 243 and *People* v. *Newton,* 185 Misc. 405.)

Accordingly, after the afore-mentioned " neglected children " adjudication that agent of the New York Society for the Prevention of Cruelty to Children filed in this court also a criminal complaint against the defendant Belcastro which alleges, in substance, that the " cruel and inhuman treatment administered " by him on those children violated the provisions of section 494 of the Penal Law of the State of New York and subdivision 2 of section 61 of the Domestic Relations Court Act of the City of New York in that " by such acts " defendant " did wilfully contribute to the neglect of said children ".

Upon his initial arraignment on that criminal complaint the accused, pleading " Not Guilty ", was granted an adjournment to obtain counsel. Thereafter, when the case was eventually reached for trial, the Justice then sitting referred it to me for disposition; and at the close of an extended hearing of the prosecution's case I reserved decision on a motion to dismiss the complaint and paroled defendant in his counsel's custody.

After study of the minutes and of the able briefs and independent research, defendant's motion is hereby granted, on the primary ground of lack of subject-matter jurisdiction; and there is being entered simultaneously with the filing of this opinion an order directing him to be discharged.

For, the evidence is insufficient to justify an adjudication that the defendant is a " person in loco parentis " within the meaning of subdivision 2 of section 61 of the Domestic Relations Court Act and precedent interpretations of those words. (See *Matter of Bernhardi,* 151 Misc. 480; *Horseman* v. *United States,* 68 F. Supp. 522; *Meisner* v. *United States,* 295 F. 866; *Miller* v. *United States,* 123 F. 2d 715; *Dix* v. *Martin,* 171 Mo. App. 266; 42 C. J. S., p. 489; 46 C. J., Parent and Child, § 174.)

" A person *in loco parentis* has been defined as one 'who *means* to put himself in the situation of the lawful father of the child, with reference to the father's office and duty of making a provision for the child.' (2 Williams Executors [7th ed.], p. 652.)

The relationship may be shown by acts and declarations of the decedent. * * * The acts and declarations of the testator should establish that he considered himself in the place of the child's father, and that he intended to discharge the obligations of a parent. The primary obligation of a parent is to care for, support, educate and provide for his child. There must be proof of the assumption and performance of these obligations." (*Matter of Bernhardi,* 151 Misc. 480, 482, *supra.*)

" ' *In loco parentis.*' In the place of a parent; instead of a parent; charged factitiously, with a parent's rights, duties, and responsibilities; and, more specifically, the relationship which a person assumes toward a child not his own, holding the child out to the world as a member of his family toward whom he owes the discharge of parental duties." (42 C. J. S., p. 489.)

" A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. The assumption of the relation is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that relation." (46 C. J., Parent and Child, § 174, pp. 1334–1335.)

Thus, the basic question is one of intent, expressed by appropriate conduct; and, measured by such tests, defendant Belcastro does not come within the category of a " person in loco parentis ". These particular children and their mother were wholly dependent upon department of welfare public assistance; defendant contributed nothing to their support, nor did he hold himself out as stepfather. His only role comparable to that of parent was administration of corporal punishment at the mother's request and *as her agent.* According to her testimony, she and he have been friends for many years and contemplate matrimony when and if she be divorced from her second husband, but meanwhile their relations have been platonic only. Moreover, assuming *arguendo* that meretriciousness may nevertheless be inferred from the neighbors' testimony as to the frequency and hours of defendant's visits and his occasional remaining overnight in her apartment, that kind of casual and indirect contact with her children would not clothe defendant with the rights and duties of a father. Obviously, not every paramour of a mother becomes *ipso facto* a " person in loco parentis " to her offspring by other men. A " person in loco parentis " relationship implies definite obligations to the children themselves; and only an

individual who intends to assume them, and overtly does, attains the legal status of a " person in loco parentis ", entitled to the rights of a parent (such as collection of a pension or death award) and correlatively charged with the duties of a parent (such as support).

Because the complaint is being dismissed as a matter of law on the primary ground of lack of subject matter jurisdiction, it is unnecessary to decide whether the corporal punishment defendant unquestionably administered was excessive and with wilful criminal intent. It is also unnecessary to decide, although a very pertinent contention, whether every corollary criminal prosecution under subdivision 2 of section 61 of the Domestic Relations Court Act should be tried only by a judge other than the one who conducted the antecedent delinquency or neglect civil proceeding; it being persuasively argued that the criminal prosecution must be predicated on a wholly separate record and governed by the strict procedure of the criminal law and that it is humanly impossible for a judge who conducted the prior delinquency or neglect civil proceeding to cast out from his mind and disregard the evidence and impressions thereof in his hearing and disposition of the corollary criminal prosecution.

That problem has been recognized by Onondaga County Children's Court distinguished Judge LEO J. YEHLE and handled by his trying the civil and criminal proceedings simultaneously, upon consent of parties and counsel.

In the absence of such consent the objection appears to me valid, especially in a case where the criminal prosecution was initiated by the Judge who tried the antecedent delinquent or neglected child civil proceeding (cf. *People* v. *Richard,* 271 App. Div. 1047; *People* v. *Haas,* 105 App. Div. 119, and *People* v. *Dormann,* 180 Misc. 160). " However upright the judge, and however free from the slightest inclination but to do justice, there is peril of his unconscious bias or prejudice, or lest any former opinion formed *ex parte* may still linger to affect unconsciously his present judgment, or lest he may be moved or swayed unconsciously by his knowledge of the facts which may not be revealed or stated at the trial, or cannot under the rules of evidence. No effort of the will can shut out memory; there is no art of forgetting. We cannot be certain that the human mind will deliberate and determine unaffected by that which it knows, but which it should forget in that process." (*People* v. *Haas, supra,* p. 122.)

As further obiter dicta it may not be inappropriate to include additional reasons for limiting recourse to subdivision 2 of section 61 of the Domestic Relations Court Act.

Venuing adult criminal prosecutions in the Children's Court Division of this civil court, unless restricted in volume and carefully screened, would become a turning-the-clock-back deviation from its diagnosis and treatment philosophy, confuse that approach with the wholly different concepts and safeguards of the criminal law, and call upon the staff to perform functions for which this court is not designed or equipped.

True, jurisdiction to prosecute adults for contributing to the delinquency or neglect of minors has been conferred by statute on Children's Courts in many States; and probably the consensus accords with the following view of Judge PAUL W. ALEXANDER, Domestic Relations and Juvenile Court, Lucas County, Toledo, Ohio, a nationally recognized leader in the field, for whom I have deep respect: " Because these contributing cases center about the relationship between child and parent, they can be handled more intelligently and constructively not in ordinary criminal courts but in socialized courts such as family and children's or juvenile courts — and especially in the court that handles the child's case. This doctrine appears to be accepted everywhere outside New York." (" What's This About Punishing Parents? ", Federal Probation, March, 1948, p. 5.)

However, Judge ALEXANDER's court is one of general jurisdiction, and it has been provided with adequate machinery, including the right to trial by jury; and in Toledo, Ohio, as in most other localities, there is not the otherwise complete separation of civil and criminal law jurisdictions existing in the city of New York (see *People* v. *Rogers,* 248 App. Div. 141, 145–146, *supra* and *Matter of Bowman* v. *Cruz,* 188 Misc. 826, 829, 831, 838, 840–841).

Thus, in this State, except in New York City, Westchester County, Albany, Buffalo, Rochester and Syracuse, the Children's Court Judge is often the County Judge, exercising complete criminal jurisdiction, and he and his staff devote much more time to adult prosecutions than to Children's Court matters; also, the supposed deterrent effect of Penal Law enforcement in a small locality hardly exists in metropolitan New York City, where even a *causé celebre* soon works its way back to the inside pages of the newspapers.

Moreover, in Children's Courts in this State outside the city of New York the contributing delinquency and neglect proceedings are proportionately few; for example, in Westchester County Children's Court only 22 out of a total of 2,221 new cases during 1948 and in Onondaga County only 38 out of a total of 436 new

cases during 1947 and 34 out of a total of 422 during 1948. And, although Westchester County Children's Court Judge GEORGE W. SMYTH and Onondaga County Children's Court Judge LEO J. YEHLE, who are highly competent, experienced, and outstanding in domestic relations and juvenile court work, deem beneficent the provisions of subdivision 4 of section 6 of the Children's Court Act of the State of New York, in combination with section 494 of the Penal Law, each invokes that remedy circumspectly and with due regard for the restricting principle that: " The provisions of the law should not be invoked for purposes of blind punishment. We are conducting a Children's Court. Our jurisdiction over adults is merely incidental to the work we do with children. The criminal courts are the appropriate tribunals for the prosecution of adults guilty of heinous crimes against children. We are concerned in the use of the criminal law merely as an aid in salvaging the delinquent and protecting the neglected, and in prescribing such penalties as may be reasonable or necessary to right wrongs committed and to secure compliance on the part of recalcitrant parents with the general objectives of our socio-legal services." (Quoted from Judge GEORGE W. SMYTH's, Oct. 21, 1948, address at the Forty-Ninth Annual Meeting of the New York State Conference on Social Work.)

The chief hazard apprehended is recrudescence of the periodic popular fallacy that delinquency is cured, or even curbed, by criminally prosecuting parents. The above-cited *Matter of Humann* v. *Rivera* case high-lighted a then program, fortunately now quiescent, of the police department of the city of New York to activate section 494 of the Penal Law (entitled " Punishment of parents, guardians or other persons for contributing to the delinquency and offenses of children ") and to stage such prosecutions in the Children's Court Division of this court (see *Matter of Bowman* v. *Cruz*, 188 Misc. 826, 827–828, 831–832, *supra*). The conviction and one-year jail sentence of said Genevieve Rivera, a mother (reversed unanimously by the Appellate Division), made the headlines and evoked many clashing expressions of approval and condemnation; the overwhelming weight of the best-considered opinions being adverse. For example:

" We, in the Children's Bureau, have been much concerned about the way in which the idea that parents of children who come into court must be punished appears to be gaining ground throughout the country. Apparently no distinction is made between situations in which parents by deliberate and overt acts have contributed to the delinquency of their children and parents who have neglected to give their children guidance by reason of

their own handicaps and limitations, to say nothing of situations in which the cause of misbehavior is beyond the control of the parents, as, for example, cases of mental illness. Such an attitude is contrary to the principle on which the juvenile or children's court was established, namely, that of seeking to help and save the child through looking behind the delinquent act in order to understand its cause and what is necessary to overcome it and meet the child's needs. In many instances we help the child only as we bring help to those responsible for him'' (Quoted from an April 8, 1947, letter of Dr. Katherine F. Lenroot, Chief of the United States Children's Bureau, Washington, D. C.)

'' Parents need reassurance and strengthening, rather than criticism * * *. A radical reorientation in public discussion of parent-child problems is needed * * *. Our entire approach to parents should be one of interest and help, rather than of blame.'' (Quoted from a report of its Executive Director Herschel Alt for the Child Guidance Institute of the Jewish Board of Guardians.)

'' Police persist in promoting punishment as a panacea. Philosophical punitive approaches please plenty of people. Purely punitive programs applied to psychopathic personalities have proved impracticable in previous practices.'' (Quoted from Lima, Ohio, Judge RAYMOND P. SMITH's '' Pass the P's, Please '', '' Newsette '' May, 1947, National Probation Association.)

'' I am weary of the old slogan in regard to juvenile delinquents: ' It is really the parents who are to blame. *They* should be *punished.*' Are not these unhappy parents already sufficiently punished? They have spent miserable years with themselves and with each other. They are tormented with feelings of guilt and bitterness as they see their misery engulfing their children. It is not our task to punish but to help.'' (Italics in the original; quoted from '' Family Dissension as a Factor in Delinquency '', Irene Kawin, Deputy Chief Probation Officer, Cook County, Chicago, 1946 Year Book of the National Probation Association, p. 76.)

'' Analysis of Toledo's Experience in Punishing Parents.

'' Now it happens that we in Toledo's juvenile court have been doing the very thing advocated, have been punishing parents with ever-increasing assiduity, for more than 10 years. When the controversy waxed we were asked by one of our colleagues on the New York City children's court bench, who happened to know of our experience, if we could throw some light on the subject. Accordingly, we got out our records for the 10-year period, 1937

through 1946, and endeavored to make an analytical, critical, statistical study of our ' contributing ' cases, and particularly to make a pragmatic examination of the efficacy of punishing parents. So far as we can learn this is the first time such a study has been attempted. * * *

" 1. *Punishment as a method of curbing or ' stamping out ' juvenile delinquency.*— For the first 7 years of our study, we punished parents more and more, and kept having more and more juvenile delinquency. Then during the last 3 years, while the punishment curve rose still more sharply, the delinquency curve started down and has continued steadily downward. Can there be a correlation between the recent increase in punishment and the decline in delinquency? Did the delinquency rate finally go down because more and more parents were being punished? It seems significant that in a great many other communities where parents have not been punished or at most punished only sporadically, a corresponding contemporaneous decline in delinquency has been experienced. Consequently it is difficult to find any correlation between the two phenomena. In other words, we find no evidence that punishing parents has any effect whatsoever upon the curbing of juvenile delinquency.

" 2. *Punishment as a method of deterring other contributors.*— Most of the rather severe sentences we meted out have made the newspaper headlines. Many were reported over the radio. Despite this wide publicity, the number of contributing parents has steadily *increased,* and is continuing to rise. Undoubtedly much of this is due to increasing alertness and aggressiveness on the part of public authorities — school, police, prosecutor, and child welfare and court workers. But we certainly find no evidence that our practice has deterred other parents from contributing. * * *

" 4. *Punishment as a method of protecting society.*— The type of offense committed by contributing parents is never an immediate or direct threat to the general security. These parents are hardly a menace to society. They are a menace to their own children. They do not have to be taken out of circulation for the protection of other children or adults (with negligible exceptions). Therefore it has not been necessary to punish these parents in order to protect society.

" 5. *Punishment as a method of avenging society.*— This, too, is something not susceptible of mathematical measurement. But we have no doubt that the punishment of many of our delinquent parents has served in some measure to satisfy the blood-lust, the punitive-vindictive appetite of self-righteous, nondelinquent

parents, irritated, aggravated public authorities, and a substantial portion of the general public.

" 6. *Punishment as a method of control.*—Punishment as a method of control of that great bulk of delinquent parents whose contributing consists mainly of acts of omission.— failure to teach, train and supervise the child from the cradle on up — is so impracticable as to be worthless, and it appears quite useless to attempt it. * * *.

"' *Conclusion*

" In fine, we might say our study seems to show that to punish parents who contribute to the delinquency or neglect of their children accomplishes very few, if any, of the things claimed for it except revenge; that in some cases where the parent is refractory and resists the casework approach, a certain amount of actual punishment may bring about co-operation; that in selected cases, where other methods have failed, prosecution and the threat of punishment, without actual punishment, are rather effective.

" But punishing parents is no panacea." (Quoted from the above-mentioned " What's This About Punishing Parents? ", Federal Probation, March, 1948, Judge PAUL W. ALEXANDER's brilliant, factual report of a long and intensive experimental study at Toledo, Ohio, under the most favorable conditions of newspaper and radio co-operation.)

On January 11, 1949, Mr. Maximilian Moss, then a leading member, and now president, of the board of education of the city of New York, vigorously took the negative in a public forum debate with Kings County District Attorney Miles F. McDonald on the topic " Should More Rigid Laws Be Enacted to Impose Responsibility upon Parents for such Failure of Control Over the Acts of Minors Under Eighteen that Foster Crime? ", Mr. Moss declaring, according to the *Brooklyn Daily Eagle* account: "' Putting parents in jail would punish the child and the rest of the family * * *. The delinquency of children is a disease of society and the responsibility of the whole community * * *. The cries for punishment are a futile gesture of those who are looking for an easy way out * * *. Parents of delinquent children need help, not jails, fines or threats and punishment."

And a May, 1948, board of education of the city of New York report, entitled " The Prosecution of School Non-Attendants ", states: " The study has shed some light upon the value of the strictly authoritarian approach which is interpreted here as the levying of a fine upon the parent. It suggests that fining a parent for the non-attendance of his child is no guarantee that there

will be an amelioration in the original situation which led to the Court action. Also there is evidence that fewer children whose parents were fined improved their social adjustments and their school achievement after Court action than was noted with children whose cases were closed with other types of dispositions.

" Improvement in school attendance after Court action was less marked than in the case of children whose parents were not fined. In addition to this, a larger proportion of children whose parents were fined in the first case were back in Court a second time in the same school year.

" One can only speculate as to whether or not conditions found would have been even less favorable had not fines been levied. Nevertheless, it seems reasonably clear that the levying of the fine did not result in as many positive changes as was found with children whose cases ended without such punitive action."

On April 11, 1947, Governor Dewey vetoed a bill (Assem. Int. No. 1388, Assem. Pr. No. 1440) which would have added to the Children's Court Act of the State of New York (L. 1922, ch. 547, as amd.) a verbatim replica of subdivision 2 of section 61 of the Domestic Relations Court Act, the veto message stating that the amendment was opposed by the New York State Department of Social Welfare and the State Youth Commission.

It is, of course, indisputable that parental inadequacy is a major cause of juvenile delinquency. But I am frankly skeptical of the efficacy of any form of criminal prosecution as a remedy and deeply feel that in any event the Children's Court Division of this court should invoke such measure sparingly, if at all, and leave to the criminal courts the essentially different function of criminal prosecution (cf. *Matter of Bowman* v. *Cruz,* 188 Misc. 826, 838–841, *supra*).

Finally, drawing on the language of the late Justice DUER as reported in *Howland* v. *Union Theol. Seminary* (3 Sandf. 82, 117, revd. 5 N. Y. 193): " This opinion has been extended to an unusual, and it may be thought an unnecessary length; but we have been actuated by the hope, that the reasons which we have labored to explain, when duly weighed, will be found " persuasive toward stopping, or at least limiting, the use of subdivision 2 of section 61 of the Domestic Relations Court Act and halting any incipient tendency toward a punitive approach in this court.

The complaint is dismissed, and defendant discharged.

Notice shall be given to the parties pursuant to the subjoined direction.