No. 32,257

The State of Kansas, *Appellee*, v. The Beacon Publishing Company, *Appellant*.

(42 P. 2d 960)

Opinion filed April 6, 1935.

*R. R. Vermilion, Earle W. Evans, Joseph G. Carey, W. F. Lilleston* and *George C. Spradling,* all of Wichita, for the appellant.

*Clarence V. Beck,* attorney-general, *Earl B. Swarner,* assistant attorney-general, *Forrest D. Smythe,* special assistant attorney-general, *Sidney L. Foulston,* county attorney, *John W. Wood* and *H. C. Castor,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Burch, J.: The Beacon Publishing Company was charged, with others, in five counts of an indictment returned by a grand jury, with violation of the statute relating to false, deceptive and misleading advertising. The publishing company was convicted on each count, and appeals.

The circumstances which led to the indictment may be related.

In Wichita the Beacon Publishing Company, a corporation, publishes a newspaper, the Wichita *Beacon.* Max Levand and Louis Levand are officers in charge, and, in common parlance, are the publishers. W. C. Shanklin is managing editor, T. L. Givens is city editor, and Charles J. Claus is advertising manager. Henry Dan, a salaried employee, solicits advertising.

Advertising is a legitimate source of profit to a newspaper, a legitimate source of profit to the advertiser, and a highly beneficial service to the public. In a sense, advertisements are informative news items. They tend to stimulate consumption of goods. That stimulates production. That stimulates employment of labor, and the result is, desirable economic consequences spread in ever-widening circles.

What were called advertising campaigns were not infrequent in Wichita. Testifying at the trial for the state, Dan said another newspaper in Wichita was conducting such a campaign, which suggested to him that he inaugurate one. He chose a "quality" campaign in the field of merchandising. To accomplish his purpose, he desired active coöperation of R. E. Hobbs, M. D., director of public welfare of the city. Mr. Claus, advertising manager, was out of town and Dan outlined his plan to the managing editor. Shanklin asked the city editor, Givens, to get in touch with Doctor Hobbs. Doctor Hobbs was interviewed, approved the program, and told Givens to go ahead with it.

Dan had in mind an advertisement which would present the appearance of an emblem of quality, reproductions of which could be furnished to the advertisers. Gundell Goldansky had been the designing artist for the *Beacon* for many years. He had previously obtained and engraved the signature of Doctor Hobbs, for use in another advertising campaign, which Doctor Hobbs had approved, and Goldansky created, or adapted, decorated and lettered a sketch, on a card, of a design to be used in advertisements to appear in a supplement to the edition of the *Beacon* of Sunday, August 20, 1933. The design was shown to Doctor Hobbs on Monday previous to August 20, and he approved it. Later in the week a proof of the advertisement of the Wichita Water Company, showing the design, as the advertisement would appear in the Sunday supplement, was shown to Doctor Hobbs. He approved it and said he would make an addition to the advertisement which would improve it, and he did so.

Advertisements were procured, which were printed, using the design, in the Sunday supplement, which was published as contemplated. One of the advertisements follows:

## OUR PRODUCTS

### SUNFLOWER SAUSAGE and PACKING CO.

**21st and Cleveland**        **Phone 3-7823**

The indictment charged that the words of the advertisement "Approved by R. E. Hobbs, M. D., Director of Public Welfare, City of Wichita," were untrue, and were known by the publishing company to be untrue. Since the case is one of first impression in this court, and is of great importance to all newspapers in the state, something may be said concerning the history of the statute relating to the subject of untrue advertising.

The law relating to false representation and deceit permits a certain amount of "puffing" by the seller in the sale of salable things. The line between sales talk and misrepresentation is frequently difficult to draw. Expressions of opinion by the seller touching the merits of his wares are not regarded as statements of fact. While the line is difficult to draw, the distinction between opinion and fact tends to become more and more narrow, in order better to prevent fraud. Falsehood, fraudulent representation, and statement which is deceiving or misleading, are condemned, and the common law provides remedies, more or less effective, to the injured person.

Losses resulting from untrue advertising reach gigantic sums every year. The common-law remedies do not furnish adequate redress to victims, and demand arose for legislation with penal sanction, to cope with the evil. A movement to that end was fostered by many business men's organizations, advertising clubs and associations, and others interested in truthful advertising. A history of the movement may be found in 36 Yale Law Journal at page 1155. The well-known magazine, *Printers' Ink*, sponsored a model criminal statute to be adopted by state legislatures, and Mr. Henry D. Nims prepared for the magazine what became known as the Printers' Ink model statute. The statute was designed to be comprehensive with respect to subjects and methods of advertising. The essence of the statute, so far as material here, was that anyone who, with intent to sell merchandise, shall publish in a newspaper an advertisement containing a statement of fact which is untrue, deceptive, or misleading, shall be guilty of a misdemeanor. A notable feature was that words such as "knowingly," "willfully," "with intent to defraud," "with intent to deceive," and the like, were not used. The theory was, the advertiser knows or should know the truth, and he was made absolutely responsible for the integrity of his advertisement. Another notable feature was that the newspaper or other organ of dissemination in which the advertisement appeared was not subject to punishment.

The model statute was adopted in a number of states; in others it was adopted in modified form; in others, adoption was defeated; and some states which adopted the statute in some form subsequently amended it. In 1915 a decided variant from the model statute was introduced in the legislature of this state as Senate bill No. 229, by Senator Kinkel, by request. The bill was passed, became effective as a law on March 17, 1915, and section 1, which appears as R. S. 21-1112, reads:

"SECTION 1. That any person, firm, corporation or association, who, with intent to sell or in any wise dispose of any merchandise, securities, service or anything offered by such person, firm, corporation or association, directly or indirectly, to the public for sale or distribution, or with intent to increase the sale or consumption thereof, or to induce the public or any person in any manner to enter into any obligation relating thereto, or to acquire title to or an interest therein; who makes, publishes, disseminates, circulates or places before the public, or causes the same to be done, either directly or indirectly, in this state, whether by newspaper publication or otherwise, as herein provided, any label, notice, handbill, poster, bill, circular, pamphlet, or

letter, or in any other way, any advertisement of any kind or character regarding merchandise, securities, service, or any other thing or commodity offered to the public, which advertisement contains any assertion, representation or statement which is in fact untrue, deceptive or misleading, shall be deemed guilty of a misdemeanor and, upon conviction in any court of competent jurisdiction, shall be punished by a fine in any sum not exceeding five hundred dollars, or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment for every such offense, and each day such publication or communication shall be published or disseminated shall constitute a violation of the provisions of this act and shall be deemed a separate and distinct offense: *Provided, also,* That the provisions of this act shall not apply to the publisher of any newspaper or other publication, who publishes or causes to be published, disseminated or circulated any written or printed statement prohibited by the provisions of this act, without knowledge that it is false."

Like the model statute, this statute embraces many classes of promotions which may be aided by advertising, and many means of advertising. Like the model statute, the only "intent" involved is that of the advertiser to sell, etc., to increase sale or consumption, etc. No intent to deceive, defraud, or mislead is required. Culpability lies in the character of the published advertisement. If it be untrue, deceptive, or misleading, the advertiser is subject to punishment. If a newspaper publisher should use his own paper to advertise whatever he offers, he would be simply an advertiser.

Responsibility of a newspaper publisher for publishing another's advertisement, which was absent from the model statute, was brought into the statute by the concluding proviso. The proviso says the provisions of the act (doubtless the penal provision) shall not apply to the newspaper publisher who publishes a prohibited statement (untrue, deceptive, or misleading) without knowledge that the statement is false. False means not true, and subtle statements garbed in apparent candor, which deceive and mislead, are not included.

There was debate in state legislatures with respect to whether newspaper publishers should be held for publication of the advertiser's copy at all, and if held, to what extent? Advertisements are shrewdly prepared. Must a newspaper publisher refuse an advertisement, or take the risk of fine or imprisonment, or both, should a jury conclude, against the publisher's honest judgment, that the advertisement is deceptive or misleading? As indicated, the statute limits liability of the newspaper publisher to instances in which the statement in the advertisement is false, and is known

by the publisher to be false. The distinction is illustrated by comparison with the Iowa statute, the principal portion of which forms a section in substance the same as ours, preceding the proviso. Then follows a well-framed section on the subject of our proviso, which reads (italics used for emphasis):

"The provisions of section 13,069 shall not apply to any owner, publisher, printer, agent, or employee of a newspaper or other publication, periodical, or circular who in good faith and without knowledge of the falsity *or deceptive character* thereof, publishes, causes to be published, or takes part in the publication of such advertisement." (Code of Iowa, 1931, § 13,070.)

Interpreted in the manner described, the court regards the statute as constitutional.

The paternity of the indictment on which defendant was convicted is not known. The county attorney did not draw it, and authorship has not been recognized by the attorney-general in the manner required for recognition of illegitimates. The form got into the grand jury room, and came out an indictment, and is probably the worst piece of criminal pleading which it has been the misfortune of the court to peruse.

The fourth count of the indictment, to which a copy of the advertisement reproduced above was attached, follows:

"FOURTH COUNT

"The grand jurors of the state of Kansas, duly empaneled, charged and sworn by the court aforesaid, at the term aforesaid, on their oath do find, charge, and present, that on or about the 20th day of August, 1933, at and within the county of Sedgwick and state of Kansas, and within the jurisdiction of this court, one Max M. Levand, then and there being the general manager and president of the Beacon Publishing Company, a corporation duly organized and existing under and by virtue of the laws of the state of Kansas, and publisher of a daily newspaper known as the Wichita *Beacon,* in the city of Wichita, Sedgwick county, Kansas, and Louis Levand, then and there being the publisher and one of the managing agents of the Beacon Publishing Company, a corporation duly organized and existing under and by virtue of the laws of the state of Kansas, and publisher of the Wichita *Beacon,* a daily newspaper published and circulated in the city of Wichita, Sedgwick county, Kansas, and the Beacon Publishing Company, a corporation duly organized and existing under and by virtue of the laws of the state of Kansas, and publishing a daily newspaper known as the Wichita *Beacon,* in the city of Wichita, Sedgwick county, Kansas, then and there being, did unlawfully, intentionally, willfully, and knowingly make, publish, disseminate, circulate, and/or place before the public and/or cause the same to be published, disseminated, circulated, and/or placed before the public, directly and/or indirectly in the city of Wichita, county of Sedgwick and state of Kansas, an advertisement, label,

notice, letter, and/or pamphlet, regarding merchandise and service and/or commodity known as the products of the Sunflower Sausage and Packing Company, a copy of which advertisement is hereto attached, marked 'Exhibit D,' and made a part hereof as fully as if set out at length herein, said commodity and merchandise being offered to the public with intent to sell and/or dispose of said merchandise to the public for sale or distribution and/or with intent to increase the sale and consumption thereof and to induce the public and any person to enter into obligations relating thereto, said merchandise and commodity so advertised and offered to the public purporting to be approved by the city health officer, to wit: R. E. Hobbs, M. D., director of public welfare, city of Wichita, and which advertisement contains the assertion, representation, and/or statement that said products of the Sunflower Sausage and Packing Company, were approved by the city health officer, R. E. Hobbs, M. D., director of public welfare of the city of Wichita, which assertion, representation, and/or statement was in fact untrue, deceptive, and/or misleading, and known to be untrue, deceptive, false and/or misleading, by them, the said Max M. Levand and Louis Levand and the Beacon Publishing Company, a corporation aforesaid, at the time said advertisement, label, notice, letter, and/or pamphlet was published, printed, circulated, and/or disseminated, all in violation of section 21-1112, R. S. 1923, and contrary to the statutes in such cases made and provided and against the peace and dignity of the state of Kansas."

Other counts were framed in the same fashion.

The code of criminal procedure reads:

"The indictment or information must contain, . . . *second,* a statement of the facts constituting the offense, in plain and concise language, without repetition." (R. S. 62-1004.)

"The indictment or information must be direct and certain as it regards the party and the offense charged." (R. S. 62-1005.)

As indicated, the statute was designed to cover whatever may be advertised and all ways of reaching people by advertisement. Specification of merchandise, securities and service shows they are distinct subjects of advertising. While merchandise and securities are sold, or otherwise disposed of, service is rendered, as by working, furnishing aid or help, supplying facilities, and the like. The advertisement reproduced above related to products, and judging from the name of the advertiser, one of the products was sausage. Another advertisement related to bread, another to milk and milk products. All advertised articles were merchandise. All were pleaded as service.

To sell or in any wise dispose of meat and bread and milk is one thing. Under the statute, to induce the public or some person to enter into obligation respecting commodities, is something else. All the advertisements were charged as involving creation of obliga-

tions. No label, notice, letter, or pamphlet was involved, and no indirection in reaching the public was involved. No effort was expended, in framing the indictment, to analyze the statute and apply it to the advertisements complained of, and the result was, the indictment became multifarious jargon.

In the indictment, corporate organization of defendant and place of publication of the *Beacon* were alleged at length three times. The words of the indictment, "intentionally, willfully, and knowingly," are not found in the statute, and would tend to emasculate it if they were. The statement of the advertisement on which prosecution was based was alleged to be deceptive and misleading, something for which defendant could not be prosecuted. The certainty-destroying expression "and/or" was used fourteen times.

In reading the indictment, the court told the jury to disregard "/or." The jury should have been told to disregard "and/or" and all that followed to which the expression supposedly pertained.

To protect against mistake in judgment, carelessness, and incompetency, the criminal code directs that in considering the sufficiency of an indictment, surplusage shall be disregarded. If, using the advertisements themselves as guides, the direction be vigorously observed, the little that would remain of each count of this indictment would probably serve to charge defendant with publishing a prohibited advertisement, knowing it to be false.

Defendant did not merely plead not guilty. Defendant filed an answer, which admitted corporate organization, admitted publication of the *Beacon*, and admitted publication of all the advertisements set forth in the indictment. The purpose and intent of the advertisers were not in fact in dispute, and the answer narrowed the issues to be tried to just two matters: First, was the statement common to each of the five counts, "Approved by R. E. Hobbs, M. D., Director of Public Welfare, City of Wichita," untrue? Second, if the statement was untrue, did defendant know it was untrue?

The state produced a number of witnesses who were allowed to testify, over objection, that they were solicited to run advertisements in the Sunday supplement, of the same kind as those published, and the conversations with the solicitors were repeated. The testimony was professedly offered under the rule permitting evidence of similar offenses, to show guilty knowledge. The rule had no application to the issues. Publication of five advertisements was

specifically admitted. Defendant was prosecuted for publishing those advertisements, and evidence of a thousand solicitations to take other advertisements of the same kind would have no tendency to establish falsity and knowledge of falsity of the published advertisements.

The state says the testimony would have a bearing on intent and motive. What would intent and motive to do several times more what defendant admitted it had done five times amount to? Besides that, as indicated above, the statute, down to the proviso, deals with just one person, the advertiser, who with intent to sell, increase sales, etc., concocts and publishes an advertisement, untrue, false, or misleading. Such an advertisement is prohibited, under prescribed punishment. The proviso deals with another person, the newspaper publisher. His intent in publishing a prohibited advertisement is not an ingredient of his offense. If the advertisement be untrue and he knows it to be untrue, and publishes it, his offense is complete, whatever his intention, motive, purpose, or what not.

The character of advertisements to appear in the *Beacon* Sunday supplement was brought to the attention of Bert C. Wells, city manager, on Saturday, and in the Wichita *Evening Eagle* of the same day he published the following:

"EXECUTIVE DEPARTMENT

"CITY OF WICHITA, KANSAS

"*To Whom It May Concern:*

"It has been brought to my attention that an advertising racket of some description is being followed in the city involving a seal of approval of the City Health Department and the signature of the director of public welfare, Dr. R. E. Hobbs.

"Anything of this character has been without the knowledge of the city and is not authorized either by the City Health Department or by the director of public welfare.

"This notice is a warning that any practice involving the use of the City Health Department or Doctor Hobbs is in violation of law and will not be permitted. Neither Doctor Hobbs nor the City Health Department has any seal of approval.                    BERT C. WELLS, *City Manager.*"

This notice was introduced in evidence, over objection. Admission of the notice in evidence was error.

No use of seal of approval of the city health department, or of Doctor Hobbs, or of any seal of anybody, was charged in the in-

dictment or was involved in the case. It was perfectly immaterial whether Doctor Hobbs or the city health department had a seal of approval, or whether anything of that character was authorized by the city health department or by the director of public welfare, or was known to the city.

The designing of advertisements is a special field of creative endeavor. Designs range from the figure of a bull, which may be daubed on the side of a barn, vulgarity of the design being accentuated by a scrap of fence, to a reproduction of an old engraving on copper plate of the highest artistic excellence, on which are superimposed, in beautiful typography, the words "Rolls-Royce." What Goldansky did was to create a background for certain words to appear beneath the words "Our products," and all the indictment charged was, that the words were untrue.

Not only was there no charge that the background was a seal of any kind or of anybody, but there was no charge the background was a simulation of a seal or anything else, and the only issue presented with respect to the design was, whether the superimposed words were true, as applied to the products indicated in the advertisement.

Shanklin testified he read Wells' signed statement published in the *Eagle*, and the state contends the statement was notice to Shanklin the words of the advertisement were not true. The statute does not impose fine, or imprisonment, or both fine and imprisonment, for mere notice of falsity which, if followed by investigation, might lead to knowledge. There must be knowledge, and no caustic declaration volunteered by some disturbed city official about rackets and seals could bring home to Shanklin knowledge in fact that the words on the design were untrue.

In its case in chief, the state was permitted, over objection, to prove by Wells that he did not authorize use of the design. Whether Wells authorized use of the design was a subject quite foreign to the case, and whether Doctor Hobbs exceeded authority of his office, or violated instructions, in giving approval, was quite foreign to the case. The only question was, Did he approve?

While on this subject, it may be noted that Shanklin testified, and nobody disputed his testimony, that about noon on Saturday Doctor Hobbs came to the *Beacon* office, told Shanklin his resignation had been demanded, said he thought he would be fired, and

said he had been asked to sign an affidavit that the advertisements were unauthorized, but he had refused to do so.

The district court's instructions misconceived the statute with respect to the subject of intent, and the verdict actually found the Beacon Publishing Company guilty of publishing the advertisement exhibited above, with intent of the *Beacon* to sell the sausage company's products. The instructions misconceived the statute with respect to the subject of deception, and the jury found the *Beacon* guilty of publishing statements which were deceptive.

The instructions injected some extraneous matter into the case. The court instructed the jury in effect that the advertisements belonged to the prohibited class, if, in fact, the merchandise had not been "officially inspected," and approved by the director of public welfare. The basis of the welfare director's approval was not material, so long as he did approve.

The court gave the jury two instructions, which follow:

"Both the state and the defendant are entitled to the separate judgment of each juror. It is the duty of each juror to refuse to concur in a verdict of guilty unless and until he is satisfied that each and every fact necessary to establish the guilt of the defendant has been proved by the evidence to his satisfaction beyond a reasonable doubt.

"It takes all of the jury to convict or all to acquit. Hung juries are an abomination to any court, an abhorrence to taxpayers and a reproach upon the members thereof."

The first instruction is an abbreviation of an instruction to be given in criminal cases which this court has several times approved. The instruction properly authorized a hung jury under the conditions stated. The second instruction nullified the first, because if a juror should do his duty, or a small minority of jurors should do their duty and refuse to concur with the others, their conduct would be an abomination to the court, an abhorrence to the taxpayers and a reproach to themselves. The second instruction was improperly given. (*Neely v. Travelers Ins. Co.*, ante, p. 691.)

A separate verdict was returned for each count. The verdicts were identical in form, and one of them reads:

"We, the jury, empaneled and sworn in the above-entitled case, do upon our oath find the defendant, The Beacon Publishing Company, a corporation, guilty of publishing, disseminating and circulating, an advertisement regarding merchandise, containing a statement which was in fact untrue and deceptive, with the intent to sell or dispose of said merchandise to the public and

with the intent to increase the sale and consumption thereof and to induce the public and any person to enter into obligations relating thereto, in violation of section 21-1112 of the Revised Statutes of Kansas, 1923, as charged and set forth in the fourth count of the indictment."

It will be observed the verdict was not a general verdict of guilty. The verdict specified the things of which defendant was guilty, and from what has already been said, all of it after the word "untrue" should be stricken out except the concluding words, "in violation of," etc. While the verdict found defendant guilty of publishing an advertisement regarding merchandise, containing a statement which was in fact untrue, the verdict did not find defendant guilty of publishing the advertisement with knowledge of the fact that the statement was untrue. That was indispensable to a finding that defendant was guilty under the statute, and the verdicts as verdicts of guilty were contrary to law.

There were other defects in the proceedings, but from the foregoing it is perfectly manifest the conviction cannot be allowed to stand, and the question arises: What shall the order of this court be?

Doctor Hobbs was consulted before the advertising campaign was started. He approved it, and agreed to coöperate as he had done before in other campaigns. He was shown just what form advertisements would take, and he approved the form shown him. He wrote an article to be printed in connection with the advertisements, and the article was printed, together with a cut of himself. One of the advertisements related to mattresses, concerning which there is a statute. Doctor Hobbs gave an interview relating to mattresses, to be printed in connection with the advertisements, and the interview was published in the supplement.

On Saturday, with the material for the supplement assembling for printing and for distribution on Sunday, he was called on the carpet by the city manager. · The city manager had a picture on a card of the design to be used in the advertisements. Doctor Hobbs saw it and knew it was to be used as an advertising measure. The result is, Doctor Hobbs was intimately associated with the publication of the advertising supplement to contain advertising, the form of which he knew and approved. He used the expression "O. K.' d," which meant approved.

On Saturday, after the interview with Wells, Doctor Hobbs went

to the *Beacon* office. He saw Shanklin, Givens, and Goldansky. Goldansky testified he asked Doctor Hobbs if he would like to see the smaller cuts, made from the original design, for the advertisements. There were different sizes for different advertisements. Doctor Hobbs replied he did not have time, he was going on his vacation, and he was sure they were all right.

Doctor Hobbs was called by the state in rebuttal. He testified he had heard Goldansky's testimony, and then testified:

"I can't remember him telling me about different sizes, so, for sure, I can't say I knew anything about the various sizes until Sunday night."

He did not dispute saying he knew they were all right.

Goldansky testified that in the same conversation he asked Doctor Hobbs how long he would be gone on his vacation, they discussed the situation in the city hall, and Doctor Hobbs said the cuts were all right, the (advertising) section was all right, and everything was all right. On rebuttal, Doctor Hobbs said nothing about this part of his conversation with Goldansky.

Continuing to make its evidence speak of one thing while the indictment spoke of another, the state centered its attack on use of the seal. Doctor Hobbs testified that when Givens consulted him, he told Givens any time they O. K.'d anything, they would have to know what they O. K.'d. The water company advertisement was the only one he saw and approved, and the five advertisements which appeared in the paper were run without his knowledge or approval. This was not important, if true. Defendant was not charged with publishing advertisements which Doctor Hobbs had not seen and had not approved. The charge was, that a statement in the advertisements was not true, and the state introduced no testimony that the products of the five advertisers were not approved by Doctor Hobbs.

On cross-examination by defendant, Doctor Hobbs testified two food inspectors made weekly and monthly inspection of various food establishments, to see that everything was done according to law and, on complaint, furniture stores were investigated with respect to mattresses. Previous to August 20 four of the establishments involved in the indictment had been inspected, one of them had been inspected by Doctor Hobbs himself, and a few mattress complaints had been investigated. Doctor Hobbs testified that when Givens came to see him about the advertising supplement, he told Givens

he would O. K. any reputable firm. If Givens had any doubt, Doctor Hobbs would send an inspector out to see. Doctor Hobbs also testified that if he had been asked to do so, he would have made a statement that the five places had been inspected and found O. K., and Doctor Hobbs testified as follows:

"Q. Now, Doctor Hobbs, didn't you tell Hank Givens, during the week preceding August 20, 1933, when he came over to see you about this proposed advertising supplement, that all reputable firms had been inspected by your department and were undoubtedly all right? A. Yes, I made that statement."

The result is, reputable firms were approved by Doctor Hobbs for purpose of the advertising campaign. There was no suggestion at the trial that any one of the five advertisers was not a reputable concern, and as indicated, Doctor Hobbs testified he would have made a specific statement they had been inspected and found O. K. As the securing of advertisements under this approval progressed, Doctor Hobbs was shown the precise form in which one of the advertisements would appear, and he approved it and added a line, strengthening the advertisement. When trouble broke, he did not countermand the publication of his article, or his interview, or his picture, or anything else which he knew would appear the next day.

The state contends the jury was at liberty to believe or disbelieve the testimony of any witness, could disregard the testimony of Doctor Hobbs, and may have done so. A jury is not at liberty arbitrarily to disregard the testimony of a witness. In this instance, the state produced Doctor Hobbs as its own witness. At the trial, the state exhibited no surprise at his testimony. He was corroborated by Shanklin, Givens and Goldansky. The testimony was all one way, and without pursuing the subject further, the state failed to prove falsity of the statement which the indictment alleged was untrue.

The judgment of the district court is reversed, and the cause is remanded with direction to set aside the judgment of conviction, and discharge the defendant.

HARVEY, J. (concurring specially): I concur in the judgment of reversal, but wish to add this: Reading the testimony as abstracted, I do not find that Doctor Hobbs approved the "products" of the Sunflower Sausage and Packing Company, or that either he or his assistants had made any examination of such products with the view of approving them. He and his assistants had examined the

premises of the company with respect to general health and sanitary conditions, and had O. K.'d or approved them in those respects. To me there is quite a difference between that and approving the products of a sausage company. It seems clear the advertisement went far beyond any statement authorized by Doctor Hobbs. He never saw the advertisement before it was printed and circulated. Substantially the same might be said with respect to each of the other advertisements mentioned in the indictment except as to the mattresses, which, perhaps, were inspected.