THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* AARON GLUBO, SEYMOUR EXELBERTH, ROBERT B. EPSTEIN and ATLANTIC SEWING STORES, INC., Appellants.

Second Department, April 21, 1958.

*Edward H. Levine* and *Vernon C. Rossner* for appellants.

*Edward S. Silver, District Attorney* (*Aaron E. Koota* of counsel), for respondent.

MURPHY, J. The principal questions presented on this appeal are: (1) whether appellants violated section 421 of the Penal Law by making an untrue, deceptive or misleading assertion in advertisements which they caused to be broadcast over the facilities of a "radio station", and (2) if appellants did, whether the Court of Special Sessions of the City of New York, Borough of Brooklyn, had jurisdiction to try them for the crime of conspiracy to violate said section, of which they were convicted.

Broadly stated, said section 421 declares it to be a misdemeanor to make any false, deceptive or misleading assertion, representation or statement of fact in any advertisement, over a radio station, offering merchandise for sale to the public. More specifically, the section provides that: " Any person * * * who, with intent to sell or in any wise dispose of merchandise * * * or anything offered by such person * * *, directly or indirectly, to the public for sale * * *, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto * * *, makes, publishes, disseminates, circulates, or places before the public, or causes * * * to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, circular, pamphlet, letter, handbill, poster, bill, sign, placard, card, label, or tag, *or over any radio station,* * * * an advertisement, announcement or statement of any sort regarding merchandise * * * or anything so offered * * * to the public which advertisement contains any assertion, representation or statement of

fact which is untrue, deceptive or misleading, shall be guilty of a misdemeanor.'' (Emphasis supplied.)

The information herein, filed by the District Attorney on March 10, 1955 in said Court of Special Sessions, contains two counts.

The first count, based on subdivision 1 of section 580 of the Penal Law, alleges a conspiracy to commit a crime in violation of section 421 of the Penal Law in that, in the County of Kings, appellants continuously from June, 1953 to December, 1954, with intent to sell and dispose of merchandise, to wit, sewing machines offered by them for sale to the public, corruptly conspired and agreed to disseminate and place before the public in this State '' over a radio station and in other ways '', advertisements regarding such merchandise, that such advertisements contained assertions, representations and statements of fact which were untrue, deceptive and misleading, and that such advertisements over said radio station were intended to be, and were, heard by the public in Kings County.

The second count alleges that, in violation of said section 421, appellants, in the same county, during the same period and with the same intent, '' in the form of a live commercial television announcement, over a television station '', disseminated and placed before the public an advertisement regarding such sewing machines, and that such advertisement contained an assertion, representation, and statement of fact which was untrue, deceptive and misleading, in that it was falsely represented that appellants would sell a '' Queen Anne Console Magic Stitcher '' sewing machine with a sewing chair for the price of $29.50, whereas in truth and in fact appellants did not intend to sell the article so advertised at the price stated.

As part of the first, or conspiracy, count, the information recites five specific overt acts by appellants in furtherance of the conspiracy: (1) that appellants on December 7, 1953 entered into a contract with station WATV for the telecasting of an advertisement prepared by appellants, (2) that appellants instructed an employee in November, 1953 to enter fictitious sales in the books at $23 a machine, (3) that appellants instructed a salesman in May, 1954 not to sell the sewing machine advertised, under any circumstances, at the advertised price of $29.50, (4) that appellants instructed a salesman in May, 1954 ''in the method of rigging a $29.50 sewing machine so that it would not work '', and (5) that appellants' salesman in July, 1954 informed a prospective customer in Kings County that the advertised machine '' was made of cast iron and was cheap '' and told her not to buy it. The last four overt acts are apparently

intended to show that appellants implemented the conspiracy by effectively avoiding the sale of their sewing machine for $29.50.

Of course, there may be no conviction for the crime of conspiracy in the absence of the allegation and proof of at least one overt act to effectuate the object of the conspiracy (Code Crim. Pro., § 398; Penal Law, § 583; *People* v. *Henderson,* 298 N. Y. 462, 467; *People* v. *Hines,* 284 N. Y. 93, 112–113). It should be here noted, however, that the five specific overt acts enumerated above are additional or supplemental to the allegation, in the conspiracy charge itself, of appellants' basic overt acts of disseminating and placing before the public the false advertising " over a radio station " — the acts which constitute the substantive crime under section 421 of the Penal Law. That this is so is also indicated by the last paragraph of the information, which states: " The acts and transactions alleged in the foregoing counts of this information are connected together and form a common scheme and plan." Further reference will be made below as to the allegations of the information, both explicit and implicit, of the overt acts.

After a lengthy trial, the court found appellants guilty on the first, or conspiracy, count. With respect to the second count which charged the substantive crime of false advertising under section 421, the court at the end of the People's case dismissed this count " as a matter of law " on the ground that " no crime was committed in Kings County." While the dismissal was expressly *on the law* for the purpose of permitting the District Attorney to test the propriety of the ruling by way of an appeal, he has not seen fit to do so. The appeal is only from the judgment convicting appellants on the conspiracy count.

The voluminous record establishes most convincingly the following facts, which will be stated in narrative form:

Operating from the County of Queens, appellants were engaged in the entire metropolitan area in the sale of sewing machines at prices ranging from $29.50 upward. Originally their prospective customers came to them largely through newspaper advertising. However, after a newspaper strike occurred in 1953, appellants decided to resort to other advertising media. Accordingly, shortly before December 10, 1953 appellants entered into an agreement or conspiracy to broadcast or telecast over station WATV, located in Newark, New Jersey, but received all over the metropolitan area, a most attractive advertisement which offered to sell " for the closeout price of just 29.50 " their " top quality " brand new 1954 model, round

bobbin sewing machine, with an exclusive "Magic Stitcher" which darns, mends, embroiders, monograms, which sews on zippers, which appliques and quilts, which sews over pins and needles, and which sews forward and reverse — all without additional attachments. The offer included a Queen Anne console and a sewing chair and, for the first 50 who would respond, a 22-piece sewing kit and a pair of pinking shears. (The machine thus to be offered became known as the "Magic Stitcher" and from time to time will be so referred to hereafter.)

As part of the conspiracy appellants further agreed among themselves that under no circumstances would they actually sell the Magic Stitcher for $29.50 to anyone. Instead, they agreed that they would systematically attempt to subvert the sale of that machine by proving to every prospective customer that the advertised machine is actually of inferior quality and could not function properly, and by attempting to " step up " the sale to a higher priced machine.

Appellants also agreed that this subversion and " step up " scheme should be operated in this very methodical manner: In response to every inquiry for the $29.50 Magic Stitcher, they would first send a so-called " lead man " who would take the customer's order by accepting a deposit of as little as 25 cents on the $29.50 machine and who would then advise the customer that another man will deliver the machine and will instruct the customer in its operation. A few days later this second man, known as a " BF " man, would visit the customer, demonstrate the $29.50 machine, show it to be inoperable and point out that it was basically defective and inferior, and then attempt to persuade the customer to order a " top quality " machine at a much higher price — whatever the traffic would bear. Failing in this attempt to " step up " the sale the " BF " man would leave with the $29.50 machine; it would not be delivered, and the customer's deposit would be returned by mail.

This original conspiracy, which was entered into shortly before December 10, 1953, was renewed shortly before June 7, 1954, and again shortly before October 11, 1954. It was fully effectuated by numerous overt acts:

Appellants entered into three contracts: one on December 7, 1953, one on June 7, 1954, and one on October 11, 1954, with station WATV in Newark, New Jersey, for the audio and video broadcasting (televising) of appellants' advertisement making the generous offer heretofore described. Pursuant to these contracts, the advertisement was broadcast from December 10, 1953 to January, 1955, a period of some 13 months, and the

broadcasts were seen and heard in every county within the city of New York, as well as in New Jersey and Connecticut.

As a result of these broadcasts and as a result apparently of prior newspaper advertisements, appellants received thousands of inquiries and orders for the $29.50 Magic Stitcher described above. Yet, during the 7-month period from June 1 to December 31, 1953, out of 799 sales contracts and 601 actual sales, there were only 3 sales of the $29.50 machines, and these 3 were fictitious sales to the respective mothers-in-law of the appellants. For the first 6 months of 1954, out of 3,161 sales contracts and 773 actual sales, only 1 machine was sold for $29.50 or less. For the second half of 1954, out of 6,991 sales contracts and 2,236 actual sales, only 22 machines were sold at $29.50. For the entire 19-month period from June 1, 1953 to December 31, 1954, a recapitulation shows that out of 10,951 sales contracts, there were actual sales of 26 of the advertised $29.50 or less machines (including the 3 fictitious sales to the mothers-in-law), for which appellants received a total of $722.70, in contrast to actual sales of 3,584 of the higher-priced machines for which appellants received a total of $540,096.32. The gross disparity between the total number of sales contracts and the total number of actual sales represents largely deposits returned.

Appellants systematically avoided selling the $29.50 machine by having their salesmen describe its inherent defects, its real shortcomings and its actual inferior quality. Obviously, the machine was anything but " top quality ". It was in every sense undesirable because it was not lathed; it was made of cast iron; it was noisy and the working space was too small, and appellant Epstein frankly so testified. Consequently, when appellants' salesmen demonstrated the machine the vibration was such that it sounded like an " old broken down motor ". In view of its real characteristics, not too much effort was needed to " kill " the sale of this $29.50 machine.

However, if the inherent defects in the $29.50 machine did not discourage the customer from attempting to buy it, then the salesmen, in accordance with appellants' private instructions not to sell that machine under any circumstances, proceeded to say that the needle was likely to break and fly in the customer's face, that the machine was not made in one piece, that the vibration would wreck it and it might blow the tubes in the customer's television set, that the machine requires grease every few minutes, that it would also require considerable repairs from time to time at a cost of $4 an hour, and that

one woman lost her eye when the machine jammed. And, as a finishing touch to prevent the sale, the salesmen, again acting on appellants' private instructions, used a "rig" or metal bar which would enable them to operate the machine but which would cause it to jam when the customer attempted to operate it. If all these methods still failed to "kill" the sale of the $29.50 machine and failed to result in a "step up" sale, and if the customer still insisted on the $29.50 machine as advertised, then the salesmen (in order to effectuate appellants' private instructions to avoid selling the $29.50 machine) would depart with the demonstration sample and promise delivery later of another Magic Stitcher. But the advertised machine, except in rare cases, was not delivered later; instead, the deposit was returned by mail.

Appellants' deliberate and systematic refusal to sell the $29.50 machine as advertised is also supported by the fact that they never had on hand more than a negligible few of such machines in proportion to their total sales of all machines.

It is appellants' contention upon this record that they did not violate section 421 of the Penal Law, because: (a) at all times they actually intended to sell the $29.50 advertised machine as a "loss leader" and, if a prospective customer persisted in his determination to buy it, they would, and in some instances did, deliver it for $29.50, (b) their advertisement, consequently, contained no untrue assertion as to such advertised machine, (c) in effect, they were merely engaged in the prevalent practice of "step up" or substitution selling, and (d) this practice does not come within the purview of section 421 of the Penal Law.

Despite appellants' contentions, we are not directly concerned on this appeal with the common practice of many advertisers in publicizing "loss leaders" and then attempting to "switch" or "step up" the prospective customer to an item of another brand, or at a higher price, after he has been lured or enticed by the "loss leader" to come into the advertiser's store, or to permit the advertiser's salesman to come into his (the customer's) home. We can agree with appellants that such a practice is not barred by section 421. If an advertiser bona fide chooses temporarily to sell overtly certain advertised items at a loss, but covertly harbors the intention, after establishing rapport with the customer, of trying to sell him other unadvertised items at a profit, that is the advertiser's privilege. Such practice, however, contemplates the unrestricted and unequivocal sale of the "loss leader" with all its true heralded virtues to all who are willing to pay the advertised

price (cf. *Electrolux Corp.* v. *Val-Worth*, 5 A D 2d 216). The loss on the advertised item is in effect part of the cost of the advertising itself.

Here, however, the proof indisputably shows that appellants' method of doing business merely simulated the "loss leader" practice. Their method was radically different in two respects: first, from the outset appellants never really intended to sell their so-called "loss leader" and, except for a few token sales, they sold virtually none; second, when in their broadcasts or telecasts appellants proclaimed the "top quality" of the Magic Stitcher, its many virtues and the fact that it was available to every person "for the closeout price of just $29.50" (with a special bonus for the first 50 buyers), they were actually making assertions, representations and statements of fact which were untrue, deceptive and misleading in every sense of those words. To escape from their factual dilemma, appellants shift their position and argue that if the proof shows, contrary to their claim, that they did not really intend to sell the machine as advertised for $29.50, then they cannot be found guilty of violating section 421, because that section bars false advertising only if there is an intent to sell the advertised merchandise, and here there was none.

Upon analysis it will be found that this argument is a specious one. It is true that section 421 prohibits false advertising only when it is accompanied by an intent to sell or dispose of the merchandise advertised. What appellants overlook, however, is that the intent to sell contemplated by this statute is the visible intent which is portrayed, or the audible intent which is expressed, by the advertiser at the time he renders his broadcast "pitch" and in which he makes the assertions, representations and statements which subsequent events show to have been untrue, deceptive and misleading. Section 421 is patently aimed at deceptive and misleading statements respecting merchandise when such statements are accompanied by any offer or promise or representation of a *present willingness to sell* the merchandise or by a *present desire to promote* its sale. The ostensible present intent to sell or to promote the sale of the product or the outward manifestation of such a present intent is the only test or criterion under the statute, not the advertiser's latent intent or his ulterior surreptitious motive to withhold ultimately the sale of the advertised product.

In other words, it is immaterial that the deceptive advertiser, whether moved by a *locus poenitentiae* or by cupidity for greater gain, fails to consummate his offer or withdraws it. Under the statute the crime of false advertising is complete

if any assertion concerning merchandise is shown to be untrue, deceptive or misleading in any material respect, provided only that such assertion is made incident to a holding out, or a prima facie intent or design to sell or to promote the sale of the merchandise, *at the time of the advertisement.* That such a holding out and that such a prima facie intent existed here is apparent from the context of the broadcasts. Indeed, such holding out and such intent are confirmed both by appellants' token sales of approximately two dozen $29.50 Magic Stitchers and by appellants' insistence that they were always ready to sell more of such machines at that price if the prospective customers persisted in their determination to buy them.

The statute (Penal Law, § 421) therefore cannot be rendered impotent, and appellants cannot gain immunity for their false assertions in reliance upon: (a) the established fact that they always harbored *a latent intent* not to sell the advertised Magic Stitcher for $29.50, and (b) the established fact that they systematically effectuated this intent by a unique combination of ingenious artifices and ingenuous revelations which conclusively proved that the advertised machine, instead of being of "top quality," actually was of "bottom quality" and was incapable of performing any one of its multiple or "magic" operations so blatantly heralded and so clearly implied in its name "Magic Stitcher".

In our opinion, appellants violated section 421 by their repeated deceptive, misleading and false assertions, in their broadcast advertisements, that the Magic Stitcher with all its proclaimed virtues could be purchased for $29.50. Their subsequent practice of methodically "killing" every attempt to buy it, at that price, a practice which was preconceived pursuant to the conspiracy, cannot retroactively render innocuous their deceptive, misleading and false assertions in their broadcast advertisements. These conclusions find implicit support in the authorities (*People* v. *Richter's Jewelers,* 291 N. Y. 161; *People* v. *Kelly,* 204 Misc. 145, 147–148; *People* v. *Custom Shops,* 267 App. Div. 168; *People* v. *Garten,* 235 App. Div. 641; *People* v. *Nessler,* 198 App. Div. 362, 364–365; *State* v. *Krasne,* 103 Neb. 11; *People* v. *Austin,* 301 Mich. 456; *State* v. *Beacon Pub. Co.,* 141 Kan. 734; 36 Yale L. J., 1155, 1157–1159).

These authorities make clear that it is of no consequence (1) whether the advertiser knows that his assertions are untrue, deceptive or misleading, (2) whether he intends to deceive a purchaser or actually does deceive a purchaser, or (3) whether the advertiser subsequently consummates any sale of his advertised product or of another substituted product at the

same or at a higher price. He is guilty if any one of his assertions concerning the product offered is in fact untrue, deceptive or misleading, provided only that such assertion be made incident to a present prima facie intent to promote the sale of the product to the public.

This interpretation of the statute is in keeping with the manifest public policy which it evinces, namely, to stop the making of untrue, deceptive and misleading statements in advertisements at the very inception of any promotional scheme in order: (a) to protect the buying public and, in advance, to prevent them from entering into contracts of purchase based on false representations put forth in the advertisement, and (b) to protect honest competitors from the unfair competition resulting from such unethical advertising practices.

Thus, in *People* v. *Richter's Jewelers* (*supra*, p. 166), the advertiser was found guilty only upon proof of a mere show-window display of a ring with an attached tag which bore an untrue representation. No one had actually attempted to buy the ring; no one had been actually deceived. The advertiser pleaded that by mistake the tag had been affixed to the wrong ring. In effect, he too argued that he did not really intend to sell the ring with the false representation attached to it. Nevertheless, his conviction was affirmed on the ground that the " statutory offense is committed by ' material misrepresentations intended to influence the bargain ' " when and if it is made " though at times such misrepresentations may be due to lack of care rather than to dishonesty."

In the *Krasne case* (103 Neb. 11, *supra*) where an identical statute was involved, a merchant advertised a sale to be held on a certain day of " $1.00 B.V.D. Union suits, now 49¢." The evidence showed that on the day specified the merchant " did not have the well-known B.V.D. underwear " on hand or available in his stock " for sale as advertised " and that he attempted to substitute other merchandise. The court held the merchant to be guilty of violating the statute because the advertisment contained a misleading statement of fact to the effect that the merchant would sell at the advertised price the advertised merchandise with all the qualities implied in its name.

In other words, to sustain a conviction under the statute there is no need to produce a victim — one who was victimized by the deceptive or misleading statements in the advertisement (*People* v. *Kelly*, 204 Misc. 145, 147, *supra*). This must be so for the obvious reason, already stated, that the very purpose of the statute is to stop the deceptive advertising at its inception before any person falls prey to its artful blandishments.

Appellants rely on a case decided by this court (*People* v. *Le Winter's Radio Stores,* 256 App. Div. 1098), which they claim holds to the contrary. While a reading of the brief memorandum decision in that case would so indicate, an examination of the record reveals that the decision is consistent with the conclusions here reached.

In the *Le Winter* case (*supra*) the merchant displayed in his show window a five-foot refrigerator on which rested a placard reading: "1938 Norge from $119.50 * * *." When an inspector from the New York City Department of Weights and Measures told the store manager that he was interested in the displayed refrigerator, the manager explained that its price was $189, that the placard stated the price to be "*from* $119.50*" (emphasis supplied) and that the inspector could get a three-cubic-foot refrigerator for $119.50 but that so small a refrigerator was not presently in stock, as there was little demand for it. We held that while the statement "from $119.50," might have lured prospective customers into the store because of the small lettering of the word "from", it could not be said to be actually untrue, deceptive or misleading and, hence, a conviction under the false advertising statute (Penal Law, § 421) was unwarranted. In the memorandum decision it is stated that "The card or advertisement and the matter thereon is not violative of section 421 of the Penal Law. * * * The sign did not indicate that the particular refrigerator upon which it was placed could be purchased for the figure stated on the sign."

As a dictum in the *Le Winter* case (*supra*), however, we also interpolated in the memorandum decision the statement that "While it [the advertisement] had the effect of luring a customer into the store, it did not have the effect of causing a customer to part with value or enter into an obligation in connection with the purchase of a commodity, as a consequence of any deceit within the meaning of the statute." By this dictum we did not hold or intend to hold that a false advertisement for the purpose of luring a person into a store to buy merchandise does not violate the statute as long as the prospective customer is not actually caused to make a purchase in reliance on the false advertisement. The sole purpose of the dictum was to emphasize the fact that the advertisement which was *utilized in that case* was not deceptive or misleading because *in that instance* it could not, and did not, actually deceive or mislead and, hence, there was no violation of the statute.

Appellants urge that section 421 relates to acts which are *malum prohibitum* and not *malum in se.* and therefore must be

strictly and narrowly construed " in manner not to embrace cases which do not clearly fall within " its terms (cf. *People* v. *Benc,* 288 N. Y. 318, 323; *People* v. *Vetri,* 309 N. Y. 401, 405–406). But even if this rule of strict construction be applied here, it must be held that appellants' deceptive and misleading assertions in their advertisements come squarely within the statutory prohibition.

It should be noted, however, that the rule of strict construction is not applicable here. The Legislature has expressly abrogated that rule with respect to all the provisions of the Penal Law. It has declared that the " rule that a penal statute is to be strictly construed does not apply " to the provisions of the Penal Law and that " such provisions must be construed according to the fair import of their terms, to promote justice and effect the objects of the law " (Penal Law, § 21). The Court of Appeals has stated, perhaps with some reluctance, that " We admit that the rule of strict construction applicable to penal statutes is modified " by this " legislative declaration " (*People* v. *Teal,* 196 N. Y. 372, 378).

Consequently, this legislative declaration has been generally respected, and the strict construction rule has been appropriately confined to penal provisions contained in statutes *other than* the Penal Law itself (*People ex rel. Mucciolo* v. *Snyder,* 269 App. Div. 985, affd. 295 N. Y. 866; *People* v. *Reilly,* 255 App. Div. 109, affd. 280 N. Y. 509; *People* v. *Brengard,* 265 N. Y. 100, 107; *Matter of Citrin* v. *Belcastro,* 196 Misc. 272, 275; cf. *People* v. *Vetri,* 309 N. Y. 401, 406, 412, *supra*; *People* v. *Taylor,* 192 N. Y. 398, 400; *People* v. *Werner,* 174 N. Y. 132).

Construing section 421 " according to the fair import " of its terms and " to promote justice and effect the objects of the law " (Penal Law, § 21), there can be little doubt as to appellants' guilt. As stated, the clear intent of section 421 is to punish any person who, in any advertisement broadcast over any radio station, makes any untrue, deceptive or misleading assertion or statement of fact concerning the product whose sale he is then attempting to promote to the public. Plainly, when appellants in such an advertisement proclaimed to the public that their Magic Stitcher is of " top quality ", that it has all the remarkable virtues previously described, and that this " top quality sewing machine " can be acquired by anyone " for the closeout price of just 29.50, the full and complete price ", they made untrue, deceptive and misleading assertions or statements of fact concerning the product whose sale they were then attempting to promote to the public. For, as noted, the proof shows that the Magic Stitcher was of " bottom quality ", that

it had none of the virtues ascribed to it and that, except in rare instances, it could not be acquired for $29.50. No measure of specious reasoning or legal acumen can change these basic and simple facts. They bring appellants' deceptive advertisements squarely within the "fair import" of the statute (Penal Law, § 421; cf. Penal Law, § 21).

It is interesting to note that the Appellate Division in the First Department recently took occasion to point out that a refusal to sell any product as advertised may be "in possible violation of section 421 of the Penal Law" (*Electrolux Corp.* v. *Val-Worth*, 5 A D 2d 216, 220, *supra*). Of course, such statement contains a cautious reservation of nonfinality because there was no need to decide the question. That dictum statement, however, clearly points to the conclusion here reached.

It may also be observed that even if appellants' deceptive statements in their advertisements be placd in the category of future promises or expressions of opinion they would still be deemed false as well as fraudulent. This is so because the facts here plainly disclose that appellants never intended to keep their promise to sell a machine, such as the one advertised, for $29.50, and that they knew their statements were untrue, deceptive and misleading when they uttered them (*Sabo* v. *Delman*, 3 N Y 2d 155, 160–161; *People* v. *Peckens*, 153 N. Y. 576, 591; *Schlenoff* v. *Kroll*, 207 Misc. 1082, 1084–1085; *People* v. *Suffern*, 242 App. Div. 353, 357–358; *Ottinger* v. *Bennett*, 203 N. Y. 554, adopting dissenting opinion of MILLER, J., 144 App. Div. 525, 532–535; cf. *People* v. *Clarke*, 252 App. Div. 122, 124–125; *Adams* v. *Clark*, 239 N. Y. 403, 410, 411).

Appellants' next principal contention is that, in any event, the trial court here (the Court of Special Sessions of the City of New York, Borough of Brooklyn) lacked jurisdiction to try them on the conspiracy count. They claim that the conspiracy agreement and all the alleged overt acts to effectuate it, occurred outside of Kings County, and they rely on the general rule that the crime of conspiracy may be prosecuted only in the county in which the conspiracy agreement was made, or in which one of the alleged overt acts in furtherance of it took place (cf. *People* v. *Vario*, 165 Misc. 842, 846; *People* v. *Levy*, 123 Misc. 845, 846; *People* v. *Murray*, 95 N. Y. S. 107, 108; *People* v. *Peckens*, 153 N. Y. 576, *supra*; *People* v. *Fein*, 292 N. Y. 10, 12–13).

It will be observed from the cases cited, that this general rule is primarily applicable to crimes prosecuted by indictment in the County Court or the Supreme Court. It is doubtful whether it is applicable to a crime prosecuted by information in the

Court of Special Sessions of the City of New York, if the crime or one of its essential elements occurred in any county within the city of New York. The statute which creates and defines the jurisdiction of such court expressly declares that it " shall have in the first instance exclusive jurisdiction to hear and determine all charges of misdemeanors committed within the city of New York, except charges of libel " (N. Y. City Crim. Cts. Act, § 31), and that the venue of any trial upon misdemeanor charges shall be " in the county wherein the offenses are alleged to have been committed " (ibid. § 32). We have held that upon the filing of an information by a District Attorney in the Court of Special Sessions of the City of New York, the court " acquires complete jurisdiction over misdemeanors committed in that city, other than libel " (*People* v. *Perrin,* 170 App. Div. 375, 377). Hence, it would appear that, while appellants might have had a right to seasonably move for a change of venue, this limited right did not necessarily give them the larger right to question the jurisdiction of the court.

In any event, however, the proof here clearly shows that at least one of the essential elements of the crime of conspiracy was committed in Kings County, as well as in every other county within the city of New York. As already indicated, the essential elements of that crime consist of the conspiracy agreement and at least one overt act to effectuate it (*People* v. *Henderson,* 298 N. Y. 462, 467, *supra*; *People* v. *Hines,* 284 N. Y. 93, 112–113, *supra*).

Here, shortly before December 10, 1953, the conspiracy agreement was entered into in Queens County, where appellants maintained their headquarters. The overt acts of broadcasting, while originating in New Jersey, were repeated in New York, since such broadcasts were relayed or rebroadcast from the Empire State Building in New York County, during the period from December 10, 1953 to January, 1955, and were heard in every county in the city of New York. The overt act of instructing one of appellants' salesmen in May, 1954 not to sell the Magic Stitcher for $29.50 under any circumstances, and the overt act of instructing one of their salesmen in the same month, upon methods of " rigging " this machine so it would not work, presumably occurred in Queens County. The overt act of appellants' salesman in July, 1954 in telling a prospective customer that the advertised machine was made of cast iron and was cheap, and advising her not to purchase it, occurred in Kings County. In other words, the conspiracy to advertise falsely and the overt acts done to implement it were spread over every county in the city of New York.

While the overt acts of broadcasting are not specifically labeled or described in the information as "overt acts" in accordance with the literal requirements of section 398 of the Code of Criminal Procedure, nevertheless such overt acts are implicitly incorporated therein. The gravamen of the general conspiracy count is that appellants conspired to violate section 421 of the Penal Law, by disseminating untrue statements in advertisements "over any radio station", with the intention of selling their sewing machine to the public, knowing and intending that such advertisements should be heard in Kings County. It may be said that here the "requirement of section 398 * * * respecting the allegation of overt acts has been met, although quite ineptly. The use of the words 'overt acts' is not indispensable, although they should be used. It is sufficient if overt acts are in fact alleged" (*People* v. *Scobie,* 257 App. Div. 854, affd. 281 N. Y. 796; cf. Code Crim. Pro., § 284, subd. 7).

In any event, the trial proceeded upon the basis of the overt acts broadcasting the advertisements containing the false assertions. Indeed, the trial revolved upon proof of such broadcasts as the foundation of the conspiracy count. Reading the information in its entirety, as we must, it is our opinion that appellants were sufficiently apprised of all the overt acts relied upon (including the broadcasting) to enable them, as they actually did, to prepare their defense to such acts. Hence, it is of no moment now, after the trial, that overt acts which are implicit in the general charge, and which have been proved without objection, were not specifically labeled as "overt acts" in the information (cf. *People* v. *Willis,* 158 N. Y. 392, 397, 398; *People* v. *McCarthy,* 250 N. Y. 358, 363; *People* v. *Scobie,* 257 App. Div. 854, *supra*; cf. Code Crim. Pro., § 284, subd. 7).

There can also be no question as to the propriety of accepting the broadcasts as proof of the overt act required to support the conspiracy, even though the overt acts of broadcasting the advertisements containing the untrue statements, also constituted the substantive crime of false advertising under section 421 of the Penal Law. True, the second count of the information charging such crime has been dismissed on the ground (erroneously, we believe, as herein indicated) that it was not proved to have been committed in Kings County. But such dismissal cannot affect the issues here. A conspiracy may be supported by any overt act intended to effectuate its purpose. While the overt act *need not* "be of itself a criminal act" and *need not* "constitute the very crime that is the object of the conspiracy" (*United States* v. *Rabinowich,* 238 U. S. 78, 86;

*People* v. *Tavormina,* 257 N. Y. 84, 93), nevertheless it may well be, and frequently is, for the "overt act is usually the commission of the substantive offense" (*Weiss* v. *United States,* 103 F. 2d 759).

Consequently, upon a charge of conspiracy it is perfectly proper to accept as the overt act the allegation and proof of the commission of the very crime which had been the subject of the conspiracy (*Allen* v. *United States,* 89 F. 2d 954, 955; *United States* v. *Offcutt,* 127 F. 2d 336, 339; *Miller* v. *United States,* 4 F. 2d 228, 230; *People* v. *Taft,* 174 Misc. 1033, 1035), especially since the conspiracy is a crime distinct and independent from the substantive crime plotted or committed by the conspirators, and one does not merge in the other (cf. *People* v. *Tavormina,* 257 N. Y. 84, 93, *supra*; *People* v. *Cadle,* 202 Misc. 415, 418; *Pinkerton* v. *United States,* 328 U. S. 640, 645; *Sneed* v. *United States,* 298 F. 911, cert. denied 265 U. S. 590).

It is well established that an overt act which is commenced within one State or county, and which is completed and becomes effective in another State or county, may be deemed to have been committed in the terminal State or county, regardless of the media used to consummate the act, whether by accomplice, courier, mail, telegraph, cable or other form of transmission, and the crime of conspiracy which it brings into being is punishable by the courts in the terminal State or county (*People* v. *Levy,* 123 Misc. 845, 846–849, *supra*; *People* v. *Vario,* 165 Misc. 842, 846–847, *supra*; *People* v. *Summerfield,* 48 Misc. 242, 244–247; *People* v. *Murray,* 95 N. Y. S. 107, *supra*; *People* v. *Peckens,* 153 N. Y. 576, 588–590, *supra*; *People* v. *Quill,* 2 Misc. 2d 72, 76–79; *Matter of Pogor* v. *Cannella,* 3 Misc 2d 99, 101–103). The decisive factor is "where the mischief is *delivered* and not where it *starts from*" (*People* v. *Levy, supra,* p. 849).

As indicated by the cases just cited, the matter is now largely governed by statute "When a crime is committed, partly in one county and partly in another, or the acts or effects thereof, constituting or requisite to the consummation of the offense, occur in two or more counties, the jurisdiction is in either county (Code Crim. Pro., § 134). Consequently, the courts, in both the county where the wrongful act originated and the county where it terminated, would now have concurrent jurisdiction.

To recapitulate: The information here, read as a whole, charges and alleges that, in an effort to promote the sale of their Magic Stitcher sewing machine, appellants engaged in a conspiracy to violate section 421 of the Penal Law: (a) by

agreeing to commit, " over a radio station ", the overt acts of broadcasting to the public in the county of Kings, the advertisements which contained the untrue, deceptive and misleading statements of fact concerning their said machine, the untrue statements being that this " top quality " machine with all its proclaimed virtues, could be purchased for $29.50, and (b) by agreeing to commit the other overt acts alleged. All the parties so understood the information because the lengthy trial proceeded on the basis of such conspiracy charge and such overt acts. By an abundance of proof the People established the conspiracy agreement and the commission of all the overt acts alleged, including especially the repeated broadcasts. By the same degree of proof the People established the falsity of the advertised statements, for the record indisputably shows (a) that the advertised machine could not be purchased at the advertised price of $29.50, (b) that appellants, pursuant to their preconceived plan, never intended to sell it at that price, and (c) that they effectuated such intent by deliberately sabotaging every attempted purchase at that price. By the same degree of proof the People established that the broadcasts and at least one, if not more, of the other alleged overt acts occurred in Kings County, as well as in the other counties of the city of New York, while the conspiracy was still in progress. The Court of Special Sessions of the City of New York, Borough of Brooklyn, clearly had jurisdiction to try appellants on this conspiracy charge as well as on the second count which charged the substantive crime of false advertising in violation of section 421 of the Penal Law.

The judgment should be affirmed.

WENZEL, Acting P. J. (dissenting). Appellants have been found guilty, under section 580 of the Penal Law, of conspiring to commit a crime. The crime which the People claimed had been the subject of the conspiracy was the issuance of untrue and misleading advertisements offering merchandise for sale (Penal Law, § 421). In our opinion, the proof did not establish that the acts which were planned would have constituted that crime.

Section 421, so far as pertinent, states that "Any person * * * who, with intent to sell * * * merchandise * * * or to induce the public in any manner to enter into any obligation relating thereto, * * * places before the public, or causes * * * to be * * * placed before the public, * * * an advertisement * * * regarding merchandise * * * so offered, * * * which advertisement contains any assertion, representation or statement of fact

which is untrue, deceptive or misleading, shall be guilty of a misdemeanor.''

The proof, considered in the light most favorable to the People, warranted findings that the corporate appellant was engaged in a retail sales business and that the three individual appellants were its executives, that the individual appellants, on behalf of the corporate appellant, caused a certain television broadcasting establishment to announce through the latter's telecasting facilities, over an extended period of time, an offer to sell sewing machines in accordance with a certain sample which was exhibited at the same time, at the price of $29.50 each, and a promise that a sewing kit would be given, at no extra cost, to each of the first 50 persons who would respond by telephone and who would make a purchase of such machine, that it was actually not the intention of the appellants to sell any such machines, that their real intention was to induce the persons who responded to the advertisements to buy a different machine at a much higher price, that, in order to turn the interest of prospective customers away from the advertised machine and to the more costly one, they planned to have a certain device installed upon models of the advertised machine which their salesmen would demonstrate on visits to the customers, which device would cause the model to break down while being operated by the customer in the normal manner, and also planned to cause their salesmen to make remarks concerning the advertised machine which would give customers the impression that it was not advisable to buy it, and that where customers insisted on purchasing the advertised machine despite the use of the said means designed to dissuade them, appellants planned that they would simply not accede to such insistence, would offer excuses for not complying with the demand and would, if necessary, return money which the customers had paid on account of their transactions.

The majority opinion might well give the impression to one who is not familiar with the record on appeal that appellants were charged with and tried for conspiring to advertise falsely that the $29.50 machine had certain capacities and qualities which it did not in fact have. The question of the true capacities and qualities of the machine was not litigated. The sole claim of falsity, which claim pervades the information, the prosecutor's statement to the court at the opening of the trial, and the entire trial, is that appellants had no intention of selling the machine they advertised for sale. It may well be, as indicated in the majority opinion, that in the ordinary action prosecuted under section 421 of the Penal Law an intent to sell

the advertised commodity may be inferred from the statements and conduct of the defendant, despite a contrary latent intent on his part, but that inference may not be indulged in for the purpose of upholding a conviction where the theory of the prosecution is to the contrary, that is, that the defendant did not intend to sell the commodity in question. The record does not indicate that the trial court expressly found that appellants conspired to misrepresent the capacities or qualities of the machine. It would be erroneous to say that any such finding was implicit in the trial court's determination that appellants were guilty of the charge as made, and it is error to rely on any such finding in this court.

Section 421 of the Penal Law must be construed "according to the fair import of [its] terms, to promote justice and effect the object of the law" (Penal Law, § 21; *People* v. *Vetri,* 309 N. Y. 401, 406) and, as stated in *Vetri* (*supra,* p. 406), under this mandate a construction "which makes penal that which is not plainly written in the statute, would hardly promote justice or effect the object of the law". Under this rule of construction, it should be held that there would not be a violation of the section unless there was, in the words of the section itself, an "intent to sell" or an intent "to induce the public * * * to enter into any obligation relating" to the "merchandise" to which reference is made in the advertisement, and the section should not be held to apply to a case such as this, in which the intent of the advertisers was, contrary to the situation contemplated by the statute, not to sell the advertised merchandise or to induce the public to enter into an obligation with respect to it, but to lure customers into exposing themselves to the efforts of the advertisers to sell them merchandise other than that offered in the advertisement. In other words, it should be deemed applicable only to a case in which the advertisement is calculated to deceive customers as to qualities or values of the advertised article, in order to induce them to part with value or enter into an obligation in connection with a purchase of the advertised article (cf. *People* v. *Le Winter's Radio Stores,* 256 App. Div. 1098).

*State* v. *Krasne* (103 Neb. 11) does not hold, as claimed by the majority, that a statute such as section 421 of the Penal Law is violated by any misleading statement whatsoever in an advertisement, that is, even one that is not intended as an inducement to buy a product which the advertiser wanted to sell. The theory upon which the defendant was there prosecuted and convicted, and upon which the conviction was sustained by the Supreme Court of Nebraska, was not for advertis-

ing to sell a certain branded garment at a stated price when in fact he had no intention to sell that specific product, or for conspiring so to advertise. The theory was that, after so advertising, he passed off to customers, or intended to pass off to them, other goods as the advertised branded garment.

It is not to be denied that a sales campaign such as appellants conducted is morally offensive, but it does not constitute the crime contemplated by section 421 of the Penal Law. Accordingly, the planning of such a campaign is not a criminal conspiracy to commit the crime set forth in said section.

The judgment should be reversed and the information should be dismissed.

BELDOCK and UGHETTA, JJ., concur with MURPHY, J.; WENZEL, Acting, P. J., dissents and votes to reverse the judgment and to dismiss the information, in opinion, in which HALLINAN, J.. concurs.

Judgment affirmed.